2025 IL App (1st) 220584-U

SECOND DIVISION
August 19, 2025

No. 1-22-0584

**NOTICE**: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of |
| Plaintiff-Appellee, | ) ) | Cook County |
| v. | ) ) | 12 CR 20961, 15 CR 15050 |
| | ) | |
| EDDIE FLEMING, | ) ) | Honorable Michell McDowell Pitman, |
| Defendant-Appellant. | ) ) ) | Judge Presiding. |

_____

JUSTICE ELLIS delivered the judgment of the court.
Justices McBride and Howse concurred in the judgment.

**ORDER**

¶ 1     *Held*: Affirmed. Evidence was sufficient to prove guilt. Defendant did not show error or prejudice in joinder of offenses or joinder of defendants. Prosecutor did not make prejudicial comments in closing argument.

¶ 2     On October 9 and 10, 2012, several young men went on a crime spree through Chicago and the south suburbs that left two people dead and several others robbed or carjacked. The State charged defendant Eddie Fleming with both murders and some—but not all—of the other crimes. The case culminated in a dual jury trial, with separate juries hearing evidence about the alleged crime spree involving Fleming and his codefendant, Darrell Leverson. The jury found Fleming guilty of two counts of murder and several armed robberies. He now sits in prison for life.

¶ 3    Fleming appeals, arguing that the evidence was insufficient to convict him, that he was prejudiced when evidence of Leverson's crimes (with which Fleming was not charged) was admitted at his trial, and that the prosecutor made prejudicial comments in closing. We affirm.

¶ 4                                    BACKGROUND

¶ 5    The crimes here spanned multiple days and cities and involve a lengthy cast of characters. Much, though not all of this crime spree was previously recounted in our decision regarding codefendant Leverson. See *People v. Leverson*, 2024 IL App (1st) 211083, ¶¶ 8-47.

¶ 6    Broadly speaking, the State alleged that Fleming and Leverson were part of a crew that committed several felonies, beginning on October 9 and stretching into the following day. When all was said and done, multiple people had been robbed or carjacked, one person had been shot at, and two others lay dead. In the State's telling, Fleming, Leverson, and Kevin Eason (who is not party to this appeal) were the principal players in the crime spree.

¶ 7    Eason was not part of the simultaneous trial. From the record, it appears this was due to his desire to proceed *pro se*. So while Eason is part of the overall story, we will omit any mention of which crimes he was charged with his or his legal proceedings going forward.

¶ 8    The State charged Fleming in two separate indictments. In 2012, Fleming was charged with the first-degree murder of Derrick Hampton and the armed robberies of Gregory Harris and Ravetta Moore. His codefendant Leverson was charged with these and other offenses in that same 2012 indictment. In 2015, the State charged Fleming with the first-degree murder and attempted armed robbery of Gary Clarke committed on the same day as the offenses in the 2012 indictment. (The reason for this three-year delay is neither clear to us nor relevant.)

¶ 9    Our facts come from Fleming's and Leverson's simultaneous trial before separate juries. For ease, we will break down the chronology as the general background, including an uncharged

offense; the offense charged only against Fleming; the offenses charged against both Fleming and Leverson; and the offenses charged only against Leverson. Fortunately, these different categories follow a chronological timeline in that order. And as we will see, some of the crimes occurred only minutes apart from one another.

¶ 10                                    I. General Background

¶ 11                            A. Rental of Getaway Vehicles (October 5)

¶ 12    As the State portrayed it, Fleming's criminal scheme began on October 5, 2012. On that day, Fleming called Chalynda Simpson and asked her and her sister, Fantasia, to go with him to rent some cars. Fleming suggested to Simpson that they should go to the Hertz Rental Car station at O'Hare Airport with a woman named "T.T." to get the cars. The next morning, very early, Fleming came by and picked up the Simpson sisters. They picked up T.T. on their way to the airport. The foursome drove to O'Hare, where T.T. gave the Simpsons fraudulent credit cards with their names on them. Using those cards, they rented a silver Jeep Liberty SUV and a Chevy Malibu sedan. Later that day, Simpson took the Malibu, and Flemming left with the Jeep.

¶ 13            B. Robbery/Carjacking of Deonte Gordon (October 6) (Uncharged)

¶ 14    At around 10 p.m. that night, on October 6, Deonte Gordon and two friends drove to a convenience store in Harvey. Gordon's friends hopped out and went inside while Gordon stayed in his car, a Ford Taurus sedan. Gordon noticed a silver Jeep Liberty parked next to him at the store's drive-through window. After realizing his trunk was open, Gordon got out of the car and went to close it. As he got back into the car, he heard someone say something to him. Gordon turned around to see two people had gotten out of the Jeep and were coming toward him. One of them had a gun. The two men held Gordon at gunpoint and took his cell phone and wallet. Gordon tried to get back in his car, but the men pulled him out and drove away in it. The Jeep

soon followed. Gordon went inside the store and called the police.

¶ 15    About a month later, Gordon went to the police station and identified Eason in a photograph as the person who pointed a gun at him. He identified Fleming as the person who drove the Jeep. But he admitted he could not be positive of either identification.

¶ 16            II. Offense Charged Against Fleming: Murder of Gary Clarke (Oct. 9, 8:18 pm)

¶ 17    A few days later, on October 9, 2012, Fleming picked up Darrius Bradley, his cousin, in the Jeep. Kevin Eason and Devonte Jackson were in the car as well, but Bradley did not know either of them at the time. The four men drove to a house in south Chicago, on May Street near 57th or 58th Streets, to buy some marijuana in a place Bradley referred to as "the weed block." At trial, Bradley testified that when they got there, Fleming, Eason, and Jackson got out of the car and walked around the corner to buy some weed.

¶ 18    After a few minutes, Bradley moved to the driver's seat of the car. He could not see the others, but shortly after, Bradley heard some gunshots. He did not know what was happening, but everyone came running back to the car. Bradley saw a black gun in Eason's hand, which he put into his jacket. Jackson jumped into the passenger seat next to Bradley, while Eason and Fleming climbed into the back of the Jeep. Bradley drove off and went back to where he had been picked up, near 70th and Morgan streets, where he got out of the Jeep and walked away.

¶ 19    Later, police interviewed Bradley. He identified pictures of Fleming, Eason, and Jackson, a photo of the Jeep, and a photo of a gun that Eason had carried. At trial, the State played video clips of Bradley's interview, where he told investigators that he did not stay in the car, but instead went to the "weed house" while Jackson stayed behind. Bradley also told police that Fleming talked about truck drivers having a lot of money and remembered seeing a white semi-truck. When he was on the witness stand, Bradley admitted that what he told police in the

interview was what really happened.

¶ 20    At that same time, Andrew Jackson was at home in the 5800 block of South Aberdeen Street in Chicago. (Aberdeen and May streets are next to each other.) Jackson's brother, Gary Clarke, had come into town for a visit. Clarke, a semi-truck driver, had parked his truck in an empty lot next to Jackson's home. The night was stormy, so Jackson went into the basement to work on a circuit breaker. Clarke, meanwhile, stayed out by his rig. At about 8:18 p.m., Jackson heard Clarke say to someone "I don't have any money, I don't have any money," which was met by another voice saying, "Give me the money. Give me the money."

¶ 21    Jackson went over to a window in the basement to see what was going on outside and saw someone pointing a gun at Clarke. The gunman had an "afro" style haircut, was light skinned, and stood no more than 5'8" or 5'9" tall. Two other men were near the front of the truck, and one more was at the rear, standing near the side of the house.

¶ 22    Jackson tried to use his cell phone to call 9-1-1 but couldn't get reception in the basement. He was moving around the house to find a signal when he heard a gunshot. Jackson ran outside and saw Clarke in his truck, but the men who had been there were all gone. Jackson got into the truck and tried to lift his brother out, but his brother was not moving, and Jackson saw blood on the floor of the cab. Clarke later died of a gunshot wound.

¶ 23              III. Offenses Charged Against Both Fleming and Leverson

¶ 24              A. Armed Robbery of Greg Harris (Oct. 9, 10:25 pm)

¶ 25    Approximately two hours after Gary Clarke's murder, at about 10 p.m., Gregory Harris hopped off a Pace bus in south suburban Dolton. He had come from Chicago to visit his friend, Tisha Prince, who lived near Blouin Drive and Ellis Street. While Harris was walking down Ingleside Street, near the corner of 158th, two men came up and robbed him at gunpoint. One

man was tall, the other short, but Harris could not tell what race they were. The men took Harris's designer Pelle jacket, a bag with a PlayStation 3 video game system Harris had been carrying, his watch, and his wallet. The men dashed down 158th Street; while they ran off, the shorter man yelled at Harris to turn around or he would be shot. Harris took off the opposite way.

¶ 26                    B. Murder of Derrick Hampton (Oct. 9, 10:27 pm)

¶ 27    Meanwhile, Nicole White was at her house in the 1000 block of Blouin Drive at around 10 p.m. She lived there with her parents, Denise and Derrick Hampton. White was at home while her father was outside, preparing to go to work. At around 10:30 p.m., White heard a noise outside and went to the back of the house. She walked out onto the driveway and saw her father on the ground, near his bag and some 2-by-4 pieces of lumber. White then rushed to the front of the house and saw a man across the street who was shouting that he had just been robbed.

¶ 28    That man Wallace saw was Harris, who had gone to his friend's house after the robbery. When he got there, he heard more gunshots coming from the east, further down Blouin Drive. He walked down the street and saw a person lying on a driveway. Police eventually arrived and spoke with Harris, and he told them that he had just been robbed and that it might be related to the shooting, though he did not want to file a report. But Harris later went to the police station and identified Leverson in a lineup as one of the robbers. Harris also said that he saw a gray SUV drive by him about 15 minutes before he had been robbed.

¶ 29    Curtis Rentson, a Dolton police officer, responded to a call of shots fired on Blouin Drive on the night of October 9. When he got to the scene of the shooting, he saw Derrick Hampton lying in the driveway near a side door to the building. A woman who said she was Hampton's wife told him he had been shot, and an ambulance came to take Hampton to the hospital. Renton

later went to the hospital, where he learned that Hampton had died of his wounds. Nobody witnessed the shooting or could identify the shooters.

¶ 30                    C. Armed Robbery of Ravetta Moore (Oct. 9, 10:49 pm)

¶ 31    About twenty minutes after Derrick Hampton's murder, just before 11 p.m., Ravetta Moore was driving to a friend's house in Calumet City to celebrate her birthday. She stopped at an intersection, where a Jeep Liberty also pulled up. The driver of the Jeep waved her through the interchange, and she continued on to her friend's house.

¶ 32    Upon arriving, Moore parked near the bottom of the driveway. While she was on her phone, she looked up and saw a man she later identified as Eason coming toward her, carrying a gun. He told her to get out of the car, and she did. After she got out, a taller man who was wearing a mask took her purse and threw her to the ground. The men riffled through her purse and took her phone, then ransacked her car before leaving. Moore later identified a gun found in a car connected to Eason and Leverson as the one that was used during her robbery; police later recovered a purse she identified as hers. Further, Gregory Harris's state identification card was found on the same driveway where Moore was robbed.

¶ 33                    IV. Offenses Charged Against Leverson Only

¶ 34            A. Carjacking of Robert Hopkins, Joyce Johnson (Oct. 9, 11:03 pm)

¶ 35    About ten minutes after the Ravetta Moore robbery, Robert Hopkins and Joyce Johnson were together at Hopkins's house. They had parked their cars next to each other in Hopkins's driveway at around 11 p.m. and were outside when a young man approached Hopkins, pointed a gun in his face, and demanded money from him. Another man appeared and searched through Hopkins's pockets, taking his keys and phone. The men ordered Hopkins to lie on the ground.

¶ 36    Next, the men went over to Johnson, who had been sitting in her car. The man with the gun told Johnson to get out, and after she did, she gave him a debit and credit card and some cash. Then, one of the men took Hopkins's dark blue-colored Lexus, while the other got into Johnson's Chevrolet Equinox. Both then drove off with the stolen cars. Johnson later testified that she saw them follow a silver Jeep, which had been parked on the street. A few days after the robbery, Hopkins identified Eason as one of the robbers but was unable to recognize the second robber. Johnson admitted later that she did not tell police about seeing the silver Jeep when she spoke with investigators immediately after the crime.

¶ 37                    B. Armed Robbery of Willie Douglas (Oct. 9, 11:15 pm)

¶ 38    Roughly ten minutes after those carjackings, about a quarter past 11 p.m., Willie Douglas and his girlfriend were together in Douglas's car in Riverdale. A dark-colored car pulled up next to his, and two men jumped out. One had a gun; he opened the driver's door and ordered Douglas out and to the ground. The men then went through Douglas's car, and the man with the gun riffled through Douglas's pockets and took his bank card, his cell phone, and a leather jacket. A few days later, Dougles met with police and pointed out that there had been some unauthorized withdrawals from his bank account. He then identified Eason as the gunman and Leverson as the other man who went through his car. Douglas did not mention Fleming and said he only saw two men during the robbery.

¶ 39                    C. Attempted Murder of Angel Feaster (Oct. 9, 11:45 pm)

¶ 40    About a half-hour later, Angel Feaster was parked in front of her house in south Chicago while her child slept in the rear. She was talking on her phone when a dark-blue Lexus pulled up next to her. Two people were inside the Lexus, which backed up and blocked Feaster in. The passenger, who was wearing a dark hooded sweatshirt, jumped out of the car and pulled out a

silver semi-automatic handgun, walked to the driver's side of Feaster's car, and tried to get in. Feaster threw her car into reverse and began to back up when she heard a gunshot. She sped off with the Lexus in pursuit, but she lost them when she drove to the Harvey Police Station.

¶ 41                    D. Armed Robbery of Phillips Neal (Oct. 10, 12:40 am)

¶ 42    Finally, spilling past midnight into the first hour of October 10, Philip Neal was pulling into his driveway when he saw a dark-colored Lexus drive down his street and park in front of the driveway. A man wearing a black hooded sweatshirt hopped out, walked up to Neil's car, and tapped on the window with a gun while telling Neil to get out of the car. Neal obeyed. The man put the gun up against Neil's head, demanded money, and ordered him to his knees. Another man, whom Neil later said was Eason, went through Neil's pocket's and took his money, keys, phone, a Blackberry, and a bag with a computer. The two men drove off in the Lexus.

¶ 43                    V. Subsequent Investigation and Events

¶ 44    Shortly thereafter, Officer Clarence Ayers responded to a call of an armed robbery involving a dark-colored Lexus. He eventually came across the Lexus and chased it; the pursuit ended when the Lexus crashed into the side of a building. Two people, neither of whom Ayers could see, jumped out and ran off in opposite directions.

¶ 45    Police searched the abandoned Lexus and found a Smith and Wesson semi-automatic pistol inside, near the front passenger seat. Ballistics testing later concluded that the bullet from Derrick Hampton's body and shell casings found on the scene had been fired from the recovered gun. Additionally, ballistics matched the bullet recovered from Gary Clarke's body to the same gun. When later shown a picture of the gun, Harris, Moore, and Douglas all said it was the same one the robbers used. There was a medley of DNA profiles found on the gun. Leverson could not be excluded as one contributor to the mix.

¶ 46    Neil's backpack, computer, and Blackberry were also found in the Lexus, as was Douglas's identification card, his debit card, and an ATM receipt. Additionally, police were able to match a DNA profile found on the steering wheel to Eason, and a DNA profile from the passenger-side airbag to Leverson.

¶ 47    Sometime later, Chalynda Simpson, the woman who originally helped Fleming rent the Jeep Liberty with fraudulent credit cards, called him to trade the Malibu she had rented with the Jeep. Fleming eventually came by with the Jeep, and Simpson noticed that it was damaged; Fleming told her it was because a gun had accidentally gone off. Simpson changed her mind and decided to keep the Malibu instead. But a few days later, the police called Simpson and told her they were looking for her and her sister. Simpson then called Fleming and told him to take the Malibu, and Fleming came by to pick it up.

¶ 48    Later, on October 10, at about 4:40 p.m., Riverdale Police Officer Plumey was on patrol when he was asked to help Chicago police, who were chasing a silver Jeep Liberty going east on 144th Street. When Plumey got there, he saw the silver Jeep, which looked like it had just crashed into a fence. Several people were getting out of the car and fled.

¶ 49    At about the same time, Detective Coleman of the Dolton Police Department was on duty when he heard that police were chasing a silver Jeep. Coleman drove to 114th Street and Lowe in Riverdale and heard from another officer that police were chasing several Black men who had gotten out of the crashed Jeep and fled. One of the men was described as light-skinned with a slim build, and Coleman saw a man matching that description running down 144th Street toward a house on South Emerald. Officers later arrested that man, Leverson, who was taken to the Dolton Police Station.

¶ 50    Police later found Gregory Harris's Pelle coat in the Jeep, along with a DNA profile that

matched Fleming on the driver's side door. A profile matching Eason's DNA profile was found on a bottle in the Jeep, as was another water bottle, which had Leverson's fingerprints on it.

¶ 51    On October 12, 2012, Sergeant Chuck Weeden of the Lansing Police Department went to Kevin Eason's house. After getting permission from Eason's parents, Weeden searched Eason's bedroom and found a shoe that matched another found in the black Lexus and one 9mm round of ammunition. After later procuring a search warrant, officers recovered an empty box of 9mm ammo, a purse with Ravetta Moore's ID card in it, and Joyce Johnson's keys.

¶ 52    A few days later, on October 13, 2012, police interviewed Phillip McNulty, who had been arrested but not charged in connection with the crime spree. That interview was recorded and later played for the jurors. McNulty told officers that he was in the Jeep with Leverson, Eason, and Fleming when it had crashed after the high-speed chase the day before. At trial, however, McNulty said he could not remember if Leverson and Fleming were in the car, but that he knew each of them.

¶ 53    That same day, Illinois State Police Agent Chanto Iverson went to Tatiera Weathers's home in the 6000 block of South Morgan, looking for a white Chevy Malibu. While he was waiting outside the home, Iverson saw the Malibu drive up Morgan and stop at 61st Street. It then sped off down 61st, and Iverson ran back to his car and tried to follow. With the help of some other officers in the area, Iverson caught up to the Malibu in the 6200 block of May Street, where it had been abandoned. Other police officers who were responding eventually arrested four people, including Fleming, Darius Bradley, Wille Egleston, and Jessie Bowens.

¶ 54    Meanwhile, still on October 13, 2012, Oak Forest Police Officer Belcher was interrogating Michael Joe at the Burnham Police Department. (How police came to believe Joe was tied to the robberies was never made clear.) Belcher interviewed Joe a total of four times

over two days; each interview except the first one was recorded. In those interviews, Joe said that Fleming came to see him sometime after 10 p.m. on October 9. At the time, Fleming was driving a Jeep, and he and Fleming hung out in it for about an hour while Fleming waited for Leverson and Eason. Fleming showed Joe a Coach purse (later identified as Moore's) and a PlayStation (which had been taken from Harris). Joe took the purse and PlayStation, and said he gave them to Eason the next day.

¶ 55    On October 15, 2012, prosecutor Jack Costello summoned Michael Joe before a grand jury investigating the crime spree and murders. A transcript of that testimony was entered into evidence during Fleming's trial. Joe told the grand jurors that, on October 9, 2012, he got into a silver Jeep with Fleming. Joe said that he had seen Fleming—and only Fleming—driving the Jeep around for about a week. While in the car, Fleming showed Joe a bag which had a PlayStation and purse in it, which he gave to Joe. The next day, Fleming came by to pick up Joe. Together they went to get Leverson and Eason. Joe said that he saw a Pelle coat in the back of the car, that Fleming told him that the PlayStation and purse had come from a "lick" (slang for a robbery), and that Leverson and Eason were with him at the time. Fleming also told Joe that Leverson and Eason were in a car they had stolen.

¶ 56    At trial, Joe changed his tune considerably. In court, he testified that, while he knew both Leverson and Fleming, he did not know about any of the crimes involved in the case. In what became a running theme of his trial testimony, Joe said he did not remember Fleming coming to his house on October 9 or giving him the purse and PlayStation. In fact, when he was in front of the jury, Joe seemed to remember little, if anything, about what happened.

¶ 57    Joe did admit he was interviewed by police and testified before the grand jury. Recordings of his interviews with police and a transcript of his testimony to the grand jurors

were entered into evidence. So too were photographs of various pieces of evidence that Joe had previously identified that he saw or knew about, including a picture of Harris's Pelle jacket, the Coach purse, the silver Jeep, the gun involved in the crimes, and pictures of Eason, Leverson, and Fleming.

¶ 58    To reiterate, the State charged Fleming and codefendant Leverson in a 2012 indictment with the murder of Derrick Hampton and the armed robberies of Greg Harris and Ravetta Moore. The 2012 indictment also charged Leverson, but *not* Fleming, with the additional offenses that occurred later in that short time span: the carjackings of Robert Hopkins and Joyce Johnson, the armed robberies of Willie Douglas and Phillip Neal, and the attempted murder of Angel Feaster.

¶ 59    Three years later, in 2015, the State charged Fleming with Gary Clarke's murder in a separate indictment.

¶ 60    Before trial, the State moved to join Fleming's crime-spree charges with the Clarke murder charges because they were part of the same criminal transaction. Fleming objected, arguing that he would be prejudiced by the joinder. Over his objection, the court granted the State's motion and joined the 2012 indictment with the 2015 one. The case began to move toward trial, with Leverson and Fleming opting to have juries decide their guilt.

¶ 61    Fleming's counsel also said, several times in pretrial proceedings, that he was going to file a motion to sever, and the State said there would be no objection to that severance. On a later court date, the parties again discussed severing Leverson from Fleming, and the State repeated that it had no issue with severing the defendants in the case and having dual juries—one for Leverson, the other for Fleming.

¶ 62    On April 3, 2019, Fleming's charge in the Clarke case was consolidated with the 2012 crime-spree indictment and moved to Markham, where he and Leverson awaited trial on the

crime-spree charges. The trial court noted that, based on the joinder rulings, Leverson would be tried with Fleming.

¶ 63    A few months later, Leverson's attorney filed a motion to sever his case from Fleming. In court, counsel for Leverson said that he anticipated that Fleming would try to point the finger at Leverson, and thus the two would have antagonistic defenses. The State agreed to the motion.

¶ 64    The court granted the motion and severed Leverson from Fleming. The parties would pick two separate juries, the court said, and "each Defendant's jury will hear proper evidence with regards to each Defendant." The court admonished defense counsel: "So, counsel, I will reply upon you to let me know which jury will hear which evidence."

¶ 65    While Leverson and Fleming picked separate juries, their trials were held at the same time, and both juries heard the great majority of the evidence. There were key pieces of testimony that one jury did not hear, however. For example, Fleming's jury was not present when the State played a recording of Leverson's interview with police, and Leverson's jury did not see Fleming take the stand in his own defense.

¶ 66    At trial, and in addition to testimony from the victims and other eyewitnesses, the State presented several key pieces of evidence about the investigation into the crime spree. In the Clarke killing, Paul Presnell, a Chicago Police forensic investigator, testified that he recovered a spent ammunition cartridge from the grass near the passenger side of Clarke's truck and swabbed the side of Clarke's truck for DNA samples. One of the DNA profiles found on the truck included that of Eason. Police also recovered the bullet from Clarke's body after an autopsy.

¶ 67    Sean Grosvenor, with the Illinois State Police, helped investigate the scene where Hampton was killed and collected two spent 9mm cartridges from the scene. Grosvenor later went to the morgue and collected the bullet recovered from Hampton's body. ISP investigator

Casey Morin processed the silver Jeep after it had crashed, taking swabs for DNA and lifting several dozen latent fingerprints from inside and outside of the car. Morin also found one plastic bottle on the front passenger seat and another under the seat; he swabbed the openings of each for DNA. In addition, Morin collected a cell phone, a brown coat, and a blue hooded sweatshirt.

¶ 68    Several DNA profiles found on the cars were later tied back to the suspects. One DNA profile found on the driver's side door handle of the silver Jeep matched Fleming's profile. As for the fingerprints found on the Jeep, investigators matched four of them—found on the driver's door, the rearview mirror, and radio—to Fleming.

¶ 69    Additionally, Justin Barr, an ISP forensic scientist, examined the ballistics evidence in the case. Barr testified that the gun recovered from Lexus after it had crashed was the gun that fired the bullets that killed Clarke and Hampton. Barr also tied the recovered cartridges found from the scene of both crimes to the same gun. And, in her testimony at trial, Moore identified that same gun as the one the man who robbed her used.

¶ 70    Fleming, meanwhile, testified in his own defense. On the stand, Fleming generally denied any role in the crimes on October 9 and 10. He testified that, on October 4, 2012, he and his friend, Dave, picked up Chalynda Simpson and her sister to rent some cars. Fleming said that a woman named T.T. agreed to pay him $100 for every person who rented a car using fraudulent credit cards that T.T. would provide. After picking up the Simpson sisters, the foursome drove to O'Hare and went to Hertz. Fleming left with a silver Jeep Liberty, which he was supposed to give to T.T. the next day. But Fleming said he ignored her phone calls and kept the car.

¶ 71    On October 6, Fleming gave the Jeep to Leverson, he said, for $40. Leverson promised to return the Jeep by that evening but kept the car overnight. The next morning, he told Fleming he wanted to buy the car. Fleming called T.T., who agreed to sell the car to Leverson for $300; but

Fleming told Leverson the car cost $400. Leverson paid the $400, and Fleming pocketed the extra $100. He also claimed Bradley and Joe were lying when they said he had been involved in the Clarke murder or the robberies.

¶ 72     Fleming testified that he saw Leverson in the Jeep on October 9, 2012, but did not got in the car with him. He denied being involved in the charged offenses but admitted that, on October 10, he learned that Leverson had been arrested. Several people called him, he said, because the cars they had rented with the fake credit cards were involved in the crime spree. Fleming admitted he took the Malibu back from Simpson, and that he was arrested fleeing from it.

¶ 73     In closing argument, the State placed Fleming at the center of the spree. The prosecutor argued that the "crime wave was begun and orchestrated by this Defendant, Eddie Fleming, by Eddie Fleming and his partners in crime, his crew of jump-out armed robbers, and jump-out hijackers." Fleming was the "guy in charge" of everything, the State said, because he was the oldest and "got the little shorties to go out and do his dirty work, the shorties to go out and jump out and do the robberies." The State also argued that Fleming's demeanor while testifying was further proof he was "not going to take no. Nobody is going to tell that guy what to do."

¶ 74     During deliberations, the jury sent out two jury notes. One asked if Fleming was legally responsible for Eason's actions because Fleming was 20 years old, while Eason was 16. The court told the jurors that the law of accountability did not reference age. After more deliberations, the jury found Fleming guilty of all counts. After a sentencing hearing where Fleming argued his age should be considered, the court sentenced him to natural life for the murders and 20-year sentences for the armed robberies. This appeal followed.

¶ 75                                    ANALYSIS

¶ 76     Before this court, Fleming identifies three issues. First, he alleges the evidence was

insufficient to convict him because, in his telling, it was wholly circumstantial and relied on two unreliable witnesses, Darrius Bradley and Michael Joe. Second, he was prejudiced because his jury heard evidence about Leverson's crimes with which Fleming was not charged. And third, the State committed prejudicial misconduct when it painted him as the orchestrator of the crime spree in closing arguments. We address his arguments in that order.

¶ 77                                    I. Sufficiency of Evidence

¶ 78     Due process requires the State to prove, beyond a reasonable doubt, every fact necessary to convict a person of an offense. *In re Winship*, 397 U.S. 358, 364 (1970); *People v. Cunningham*, 212 Ill. 2d 274, 278 (2004). On a challenge to the sufficiency of the evidence, the reviewing court asks whether, viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the elements of the crime beyond a reasonable doubt. *People v. Collins*, 106 Ill. 2d 237, 261 (1985). Circumstantial evidence may be enough to sustain a conviction. *People v. Wheeler*, 226 Ill. 2d 92, 114 (2007). The same standard of review applies whether the evidence is circumstantial or direct. *People v. Brown*, 2013 IL 114196, ¶ 49.

¶ 79     The fact finder's judgments as to witness credibility and the reasonable inferences to be drawn from the evidence are entitled to great deference. *People v. Ross*, 229 Ill. 2d 255, 272 (2008). We must examine the evidence with due consideration to the fact that the jury saw and heard the witnesses. *People v. Smith*, 185 Ill. 2d 532, 541 (1999).

¶ 80     Fleming starts with strong points: Nobody testified that they saw him shoot Clarke or Hampton. He did not confess to the murders or any of his charged crimes. There was no video evidence of Fleming committing the crimes. And the two victims that Fleming was convicted of robbing, Gregory Harris and Ravetta Moore, did not identify Fleming before or at trial. There was little—if any—direct evidence that Fleming was involved in those specific crimes.

¶ 81    The State built a case against Fleming entirely of circumstantial evidence, then tied the disparate pieces together into a narrative. Indeed, there are threads that Fleming was involved in various parts of the crime spree. Looking at all the evidence, the State wove a compelling narrative that, while Eason and Leverson might have been the principal players, Fleming was just offstage, helping orchestrate and support the events. That is, on its own, compelling evidence of his guilt; when two or more people engage in a common criminal design or agreement, any acts in the furtherance of that common design committed by one party are considered the acts of all the parties, and they are all equally responsible for the consequences of those acts. 725 ILCS 5/5-2(c) (West 2020); *People v. Fernandez*, 2014 IL 115527, ¶ 21.

¶ 82    Fleming focuses heavily on the testimony of Michael Joe and Darius Bradley, so we start there. Fleming's challenge to their credibility requires us to examine whether a rational juror could believe them, in light of all the other evidence in the case. That is the kind of question for which our deference to the jury, who saw both witnesses testify, is necessarily at its greatest. *People v. Tatum*, 2019 IL App (1st) 162403, ¶ 45.

¶ 83    Bradley, remember, was with the crew when Clarke was murdered. At trial, he testified that on October 9, 2012, Fleming came by driving a silver Jeep and picked him up. Eason and Devonte Jackson were already in the car. The foursome drove to 58th and May streets to buy some marijuana. Bradley stayed in the Jeep while the other three went around the corner to make their purchase. After a few minutes, Bradley heard a gunshot, and then Fleming, Eason, and Jackson came running back to the Jeep. Eason had a gun in his hand.

¶ 84    Bradley's testimony lined up with that of Andrew Jackson, Clarke's brother. Jackson testified that Clarke was visiting him in the 5800 block of South Aberdeen Street when he was killed. Aberdeen Street is one block east of May, where Bradley said the crew parked the silver

Jeep. When Jackson was in the basement of his house, he heard his brother say something to the effect of "I don't have any money" when another voice demanded money from him. Jackson looked outside the basement window and saw four men, one with a gun, surrounding his brother. Shortly after, Jackson heard a gunshot and went outside to find his brother dead. Bradley's trial testimony, at a minimum, put Fleming at the scene of the crime—which was important since Jackson could not identify the men he saw confronting Clarke before he was shot.

¶ 85    To be sure, Bradley's stories were not always consistent. After being shown video clips of what he had previously told investigators, Bradley's story changed. He admitted he got out of the car and went to buy weed, while Jackson was the one who stayed behind in the Jeep. Bradley also told investigators that, right before the robbery, that Fleming said truck drivers often had a lot of money, giving him a motive to rob Clarke.

¶ 86    In Fleming's eyes, this flip makes Bradley's statements and testimony wholly unbelievable, and thus we should set aside his testimony completely. But it is the job of the trier of fact to resolve any inconsistencies or conflicts in the testimony. *Brown*, 2013 IL 114196, ¶ 48. When confronted with which version of his story was the truth—his original testimony, or what he told the police—Bradley later admitted on the stand that what he told police was what happened. Either way, the jury heard him testify and was in a superior position to decide what to believe; his testimony is not so fanciful as to make it wholly unreliable.

¶ 87    The same could be said of Michael Joe's testimony. At trial, Joe testified to little more than that he knew Leverson and Fleming. But that's not what he told investigators and a grand jury before trial. In each instance, Joe said he was with Fleming in the silver Jeep on October 9, the day the crimes began. While they were waiting for Leverson and Eason, Fleming showed Joe a red bag that had a Coach purse and a PlayStation in it; the former had been stolen from Moore,

the latter from Harris. Fleming admitted to Joe that those items were taken in robberies.

¶ 88    Both Joe's statement to investigators (which was video recorded) and his testimony, under oath, to the grand jurors, was admitted as substantive evidence. See 725 ILCS 5/115-10.1 (West 2020). The jurors were free to consider his prior inconsistent statements as much as his live testimony before them. We are not required to weigh a prior inconsistent statement any less than other evidence, since prior inconsistent statements alone can support a conviction. See, *e.g.*, *People v. Craig*, 334 Ill. App. 3d 426, 439 (2002).

¶ 89    Fleming also notes that there is no evidence that he was present at the robberies of Harris or Moore or Hampton's murder. But as noted, Joe put the spoils of those robberies in Fleming's hands, along with an admission that he knew they were stolen. And there is ample proof that the infamous silver Jeep that Fleming helped rent was present at or near every crime in this case.

¶ 90    It is that Jeep that ties the nefarious players together—beginning with Fleming procuring it with fake credit cards just a few days earlier. A DNA profile matching Fleming's was found on the Jeep after it crashed. Deonte Gordon tentatively identified Fleming as the man driving a silver Jeep that Eason and another man got out of when they robbed and carjacked him on October 6. Fleming picked Bradley up in the Jeep before they, Eason, and another man went to buy weed in the same place, and at the same time, Clarke was shot and killed.

¶ 91    Harris said he saw a gray SUV drive past him before he was mugged, and Moore saw the silver Jeep right before she was robbed. After two men took Robert Hopkins's Lexus and Joyce Johnson's Chevy, they sped off, following a silver Jeep. And the gun that killed Clarke and Hampton, and which Harris and Moore identified as the gun the robber used, was found in Hopkins's car.

¶ 92    These disparate pieces of evidence, plus Bradley and Joe, sufficiently tie Fleming to the

crimes in this case. In other words, while Bradley and Joe may have had inconsistent stories, the wealth of other facts gave the jurors reason to believe one version of their testimony over the others. Bradley put Fleming at the scene of Clarke's murder and provided him with a motive to rob Clarke. Jackson, Clarke's brother, heard men demand money from his brother before he was shot. The gun recovered from the Lexus, stolen by Leverson and Eason, fired the shot that killed Clarke.

¶ 93    Joe, meanwhile, put Fleming with Eason and Leverson in the Jeep on the night of the robberies and with the spoils of the crimes. Harris and Moore both identified Eason and Leverson as the people who robbed them, and police recovered several stolen items from places where Eason and Leverson's DNA and fingerprints were found.

¶ 94    That was the purpose of Bradley and Joe's evidence—it allowed the State to show that Fleming, the man who fraudulently rented the silver Jeep, was at the scene of Clarke's murder and was with Eason and Leverson when they robbed Harris and Moore. And, more importantly, it made it reasonable for jurors to believe one version of their stories over the other.

¶ 95    As Fleming was charged as accountable for Eason and Leverson's actions, there need not be any evidence that *he* committed any one particular crime as the principal. *People v. Jackson*, 2020 IL App (4th) 170036, ¶ 45. Participation in a common criminal design is not necessarily explicit. *People v. White*, 2016 IL App (2d) 140479, ¶ 32. Multiple eyewitnesses identified either Leverson or Eason (or both) as the people who robbed them, and Joe and Bradley tied Fleming to them both. That Fleming "voluntarily attached himself to a group bent on illegal acts with knowledge of its design supports an inference he shared the common purpose" of the group and is accountable for its acts. *Fernandez*, 2014 IL 115527, ¶ 13.

¶ 96    In the light most favorable to the State, the evidence here is not so improbable or

unsatisfactory that it gives rise to a reasonable doubt of Fleming's guilt. The evidence was more than sufficient to sustain Fleming's conviction.

¶ 97                                              II. Joinder

¶ 98    Next, Fleming claims the court erred when it joined the charges related to the Clarke murder with the charges stemming from the crime spree. We have struggled to understand Fleming's argument here and will need to unpack it to explain why.

¶ 99    As a reminder, the court joined the Clarke-murder charges (Case number 15 CR 15050), for which only Fleming was charged, with the charges in the other indictment (Case number 12 CR 20961), which involved a string of offenses that began roughly two hours later, for some of which Fleming was charged and for some of which he was not. Fleming appears to be arguing that this particular joinder—the joinder of the charges from the *two indictments*—was error, because it allowed Fleming's jury to hear evidence that related only to crimes attributed to Leverson and not him.

¶ 100   We say "this particular joinder" because this case involved several joinders. Putting aside the indictment for the Clarke murder (15 CR 15050), the other indictment (12 CR 20961) itself joined a myriad of offenses that began at about 10:20 pm on October 9, 2012 and spilled into October 10 at roughly 12:40 am. See 725 ILCS 5/111-4(a) (West 2008) (permitting joinder of related offenses in one indictment). That indictment also joined two defendants, Fleming and Leverson. See *id*. § 111-4(b) (permitting joinder of defendants involved in related offenses).

¶ 101   In other words, there were three joinders in this case: (1) the joinder of multiple offenses related to the crime spree in case number 12 CR 20961; (2) the joinder of the two defendants in that same crime-spree indictment; and (3) the joinder of the Clarke-murder charges from case number 15 CR 15050 with those in the crime-spree indictment. Which one is Fleming attacking?

¶ 102   In the body of his argument, Fleming clearly chooses the third one: he argues that "[t]he trial court abused its discretion by granting, over defense counsel's objection, the State's motion to *join the two cases*." (Emphasis.) And indeed, that was the only joinder in which the trial court played a role; the other two joinders were the State's doing when they indicted Fleming (and Leverson) for the crime-spree charges in 2012.

¶ 103   But that feels like an odd choice of joinder to attack, given the prejudice Fleming alleges: "Joining the two cases allowed the State to introduce evidence that prejudiced Fleming because the State argued that he was accountable for Leverson's actions and the jury could not be expected to disregard the numerous additional crimes committed by Leverson when considering only the charges against Fleming." The prejudice Fleming identifies has little to do with the joinder of the Clarke-murder charges with the crime-spree charges and much more to do with the State's original joinder of *multiple offenses* and *both defendants* in case number 12 CR 20961, the crime-spree indictment, which included crimes for which Fleming was not charged.

¶ 104   So strictly speaking, if Fleming is only attacking the joinder of the charges from the Clarke-murder indictment with those in the crime-spree indictment, then his requested relief should be limited to a new trial on the 2015 Clarke-murder charges only, because the 2012 crime-spree indictment already had the problem of mixing in charges unrelated to Fleming. The only alleged taint stemming from the joinder of the Clarke-murder charges could be to those isolated charges, solely directed at Fleming. But Fleming does not limit his requested relief to the conviction for the Clarke murder. He wants a new trial on all charges. That does not follow.

¶ 105   On the other hand, the heading of Fleming's argument, which we do not usually credit as part of the substantive argument, gets much closer to what we believe Fleming is truly arguing, that he "was denied a fair trial by being tried jointly with co-defendant Leverson where the sheer

number and severity of the subsequent crimes committed by Leverson was so prejudicial that a jury could not reasonably be expected to compartmentalize the evidence for the multiple defendants." That heading, quite clearly, is an attack on the joinder of the *two defendants* in the same trial. And for the most part, that is the problem that Fleming identifies in his brief.

¶ 106   To its credit, the State, trying to cover its bases, addresses Fleming's joinder argument in every conceivable iteration. It argues that *all* the offenses—both those initially joined in the crime-spree indictment, and later the Clarke-murder charged joined with them—were properly joined *and* that Leverson and Fleming were properly joined as defendants. (Fleming did not try to clear up any confusion in his reply brief, which made no mention of the joinder argument.)

¶ 107   We will not deny Fleming his piece here, but neither will we consider arguments he has not raised in any way whatsoever on appeal. See Ill. S. Ct. R. 341(h)(7) (eff. Feb. 6, 2013) (points not raised on appeal are forfeited); *People v. Polk*, 2014 IL App (1st) 122017, ¶ 49 (same). Generally speaking, there are two ways to challenge a joinder on appeal—claiming that the standard for joinder was not met and claiming that, even if it was met, the joinder resulted in prejudice in some fashion.

¶ 108   Fleming in no way argues the first point. He does not claim or even hint that the standard for joinder, in whatever iteration, was not met. Charges may be joined in the same indictment if they "are based on the same act or on 2 or more acts which are part of the same comprehensive transaction." 725 ILCS 5/111-4(a) (West 2008). And multiple defendants may be joined in the same indictment if "they are alleged to have participated in the same act or in the same comprehensive transaction out of which the offense or offenses arose." *Id*. § 111-4(b). See *People v. Fleming*, 2014 IL App (1st) 113004, ¶ 36.

¶ 109   Fleming does not even cite these statutes, much less argue that these crimes did not arise

from the same comprehensive transaction or that the codefendants were not alleged to have participated in them. So we can set those questions aside.

¶ 110    But however awkwardly he frames it, Fleming surely *does* argue that he was prejudiced by being tried alongside Leverson and thus having some of the Leverson-only charges attributed to him. And no doubt, regardless of whether the standard for joinder is met, that joinder may prejudice a defendant, denying him a fair trial. See *People v. Bean*, 109 Ill. 2d 80, 92 (1985).

¶ 111    But even properly understood, Fleming's argument does not fly. A defendant has a remedy when he objects to a joinder due to a fear of unfair prejudice. If a defendant believes that he "is prejudiced by a *** joinder of separate charges or defendants for trial," he may ask the court to "order separate trials, grant a severance of defendants, or provide any other relief as justice may require." 725 ILCS 5/114–8 (West 2008).

¶ 112    And that is exactly what happened here. Leverson, as it happened, was the one who asked for a severance. The State did not object. And Fleming agreed as well; in fact, his attorney repeatedly indicated that he would seek a severance before Leverson's motion saved him the trouble. So the court severed Fleming from Leverson to prevent the very prejudice about which Fleming now complains.

¶ 113    Fleming got a separate jury. The trial court put everything in place so that Fleming could ensure that his jury heard only the evidence against him, not his codefendant Leverson, ruling that "we will select two juries on this matter," that "each Defendant's jury will hear proper evidence with regards to each Defendant," but with the critical caveat that "*counsel, I will rely upon you to let me know which jury will hear which evidence.*" (Emphasis added.)

¶ 114    The ball was then in Fleming's court to raise the appropriate objections or requests to dismiss his jury when evidence that pertained only to Leverson's alleged crimes was admitted.

That happened on at least one occasion, when Fleming's jury was dismissed while Leverson's jury heard testimony about Leverson's confession and watched the videotape of that confession. And of course, Fleming's jury was dismissed when the State gave its closing argument directed at Leverson.

¶ 115   But Fleming has cited to no instance in the record when his jury heard evidence only pertaining to Leverson *over the objection of Fleming's counsel*. That last part, of course, is key. It was incumbent on Fleming's counsel, not the trial court, to raise the prospect of dismissing Fleming's jury if potential testimony pertained only to Leverson and not Fleming. The court made that much clear from the outset, and given counsel's superior knowledge of the trial evidence compared to that of the trial court, that was the only sensible way to proceed.

¶ 116   Fleming cannot complain about the admission of testimony to which he failed to object at the appropriate time. That is not only a fundamental principle of forfeiture, see *People v. Jackson*, 2022 IL 127256, ¶ 15; it is even more acutely appropriate here, given that the trial court had clearly given Fleming's counsel the right and the responsibility to speak up when necessary and seek dismissal of the Fleming jury where appropriate.

¶ 117   Simply put, if Fleming's jury heard evidence pertaining to crimes attributed only to Leverson, the fault lies with no one but Fleming, who failed to seek the appropriate relief at the time despite being invited and instructed to do so. Again, Fleming cites to no example where he raised that request and was denied, and it is not our place to abandon our role as neutral arbiter and scour the record for such examples, particularly on behalf of an appellant charged with convincing us to reverse the judgments below. See *People v. Givens*, 237 Ill. 2d 311, 323 (2010).

¶ 118   In any event, as far as we have seen in the record, regarding the evidence admitted that pertained only to Leverson, Fleming's counsel did not ask the court to excuse Fleming's jury.

For example, Fleming's counsel cross-examined Robert Hopkins and Jennifer Johnson, victims of the carjackings for which Fleming was not charged, and even answered in the affirmative when the court asked, before Johnson testified, if "both juries" should be present. So we fail to see how he can be heard now to complain that his jury heard their testimony.

¶ 119                    III. Prejudicial Comments in Closing Argument

¶ 120   Last, Fleming claims the State made prejudicial comments in closing argument that denied him a fair trial. He points to the prosecutor's comments that Fleming "spearheaded" the events in question, that he was the "boss" of and "in charge" of Leverson and Eason. Fleming says the prosecutor's comments were "based on nothing but the fact that Fleming was the oldest of three defendants." Since the State's theory was that Fleming was accountable for Leverson's and Eason's actions, these comments confused the jury and prejudiced Fleming.

¶ 121   Fleming acknowledges he failed to object to these comments in closing argument. He says we should review this issue for plain error under either prong of that doctrine. See *People v. Herron*, 215 Ill. 2d 167, 178-79 (2005). Alternatively, he claims his trial counsel was ineffective for failing to object to these comments. See *People v. Albanese*, 104 Ill. 2d 504, 525 (1984).

¶ 122   But if no error occurred, then obviously no plain error could have occurred. *People v. Williams*, 2022 IL 126918, ¶ 49. And for purposes of an ineffectiveness claim, if no error occurred, then Fleming could not have suffered prejudice for counsel's failure to object, either. *People v. White*, 2011 IL 109689, ¶ 133 (prejudice required under first prong of plain-error review mirrors that of prejudice required for ineffectiveness claim); *People v. Potts*, 2021 IL App (1st) 161219, ¶ 196. So we begin with the question of whether any error occurred at all.

¶ 123   The purpose of closing argument is to give the parties a final chance to recap the evidence, apply the law to that evidence, and argue why the law and evidence compel a favorable

verdict. *People v. Nicholas*, 218 Ill. 2d 104, 121 (2005). The State is afforded wide latitude in closing argument. *People v. Wheeler*, 226 Ill. 2d 91, 123 (2007).

¶ 124   Prosecutorial comments that are not based on any evidence may be highly prejudicial and inflammatory. *People v. Mullen*, 141 Ill. 2d 394, 406-07 (1990). But a prosecutor may comment on and draw legitimate inferences from evidence or testimony in the record. *People v. Thompkins*, 121 Ill. 2d 401, 445 (1988). On appeal, we review the closing arguments in their entirety, placing the challenged remarks in context. *Wheeler*, 226 Ill. 2d at 122.

¶ 125   At various points throughout closing argument, the State claimed that Fleming "spearheaded that crime wave back on October 9th of 2012," that "Eddie Fleming, he's the guy. He's the man. He is the guy in charge" of Leverson and Eason, who "were supposed to come back and meet up with their boss, Eddie," after committing their crimes. Fleming points as well to this passage where the State characterized him:

> "He was the one in charge. He was the oldest at the time. He was 20. He got the little shorties to go out and do his dirty work, the shorties to go out and jump out and do the robberies. Of course he stayed in the car. He's the one running the show. He got those younger kids to do exactly what he wanted and to follow his orders."

¶ 126   The State made all these comments, says Fleming, despite the fact that "[t]he State did not introduce any evidence that Fleming played a leadership role in these incidents or in any way directed his co-defendants' actions." In Fleming's eyes, these comments were solely based on the age disparity between Fleming and his younger codefendants.

¶ 127   We agree with the State, however, that these comments were based on reasonable inferences from the record. When Fleming went with the Williams sisters to rent the silver Jeep with fraudulent credit cards, he procured the getaway vehicle that made repeated appearances

throughout the crime spree. In the State's telling, Fleming was the one "that orchestrated this whole scheme of renting cars. *** He's running the show." By renting the cars with fraudulent credit cards—which seemingly would be untraceable—Fleming set in motion the series of events of October 9 and 10. That's nothing more than a reasonable inference from the evidence at trial.

¶ 128   And the State based at least part of its argument that Fleming was the leader on the testimony of other witnesses as well as the testimony of Fleming himself:

> "[O]ver the last couple of weeks listening to testimony, listening to the evidence, listening to his friends and the people that he hung out with back then, the people that he felt the most comfortable with back then, listening to all their testimony, and especially after yesterday, listening to his testimony on the stand yesterday, I think it's crystal clear that Eddie Fleming, he's the guy. He's the man. He is the guy in charge. You saw his demeanor yesterday. He was not going to take no. Nobody is going to tell that guy what to do."

¶ 129   These comments fall well within the latitude given to the State in closing argument. They were sufficiently based on record testimony and the reasonable inferences to be drawn from the evidence. We thus find no error of any kind, much less plain error. And as noted, that dooms Fleming's ineffectiveness claim for failing to object to these comments as well.

¶ 130                              CONCLUSION

¶ 131   The judgment of the circuit court is affirmed in all respects.

¶ 132   Affirmed.